**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **NATIONAL WASTE ASSOCIATES, LLC,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| v. | ) ) | **NO. 3:20-cv-00654** |
| **LIFEWAY CHRISTIAN RESOURCES OF THE SOUTHERN BAPTIST CONVENTION,** | ) ) ) ) | |
| **Defendant.** | ) ) | |

## <u>MEMORANDUM OPINION</u>

This is a breach-of-contract case brought by National Waste Associates, LLC (NWA) against Lifeway Christian Resources of the Southern Baptist Convention (Lifeway). The parties contracted for NWA to manage solid waste and recycling services for Lifeway's retail bookstores for a term of five years. By thirteen months into the contract, Lifeway had closed all its retail locations and canceled NWA's services at each location. NWA sued, claiming that Lifeway breached the contract and benefited from unjust enrichment. The parties filed cross-motions for summary judgment. (Doc. Nos. 64–65, 67–68, 88, 90, 95, 97). For the following reasons, NWA's motion will be denied, and Lifeway's motion will be granted in part and denied in part. Specifically, Lifeway will be granted summary judgment on NWA's quasi-contract claims and request for contractual attorney's fees, but it will be denied summary judgment on NWA's breach-of-contract claim and request for punitive damages.

# I. BACKGROUND[1]

NWA began managing solid waste and recycling services for Lifeway's bookstores around 2006. (Doc. No. 96 ¶ 1). The parties entered a three-year contract in 2010, and when that contract expired, the relationship continued on a year-to-year basis. (Id. ¶¶ 1–2). In 2018, NWA and Lifeway entered a contract with a five-year term. (Id. ¶ 3). That contract, which the Court will now refer to by its title of "Service Agreement," became effective on November 1, 2018, and the parties agree that it is valid and enforceable. (Doc. No. 91 ¶¶ 1–2). Lifeway was motivated to contract by its desire to, among other things, have a reliable long-term partner to manage its trash program, enter an agreement with a five-year term, and experience an immediate savings of 35%. (Id. ¶ 6).

---

[1] Each party raises a slew of objections to the other party's statements of fact. These objections go to both form and substance. As to form, NWA objects to Lifeway's violating this Court's local rules by listing "a number of different claims improperly cloaked as 'facts' that are then joined together in a single paragraph." (Doc. No. 91 at 1–2 (citing M.D. Tenn. L.R. 56.01(b)). Lifeway raises the same objection once (Doc. Nos. 89 & 96 ¶ 4), and it also objects to NWA's apparent typos (Doc. Nos. 89 & 96 ¶ 35; Doc. No. 96 ¶ 43) and to NWA's citing sources other than a contract to support facts describing the contract. (Doc. Nos. 89 & 96 ¶¶ 20, 27, 31, 33–34, 54; Doc. No. 96 ¶ 28). It is apparent, however, that neither party was prevented from adequately responding to a factual assertion due to form. Moreover, federal courts prefer to resolve disputes on the merits. See Krupski v. Costa Crociere S. p. A., 560 U.S. 538, 550 (2010). Accordingly, as a matter of discretion, the Court will not disregard factual assertions based purely on their allegedly improper form.

As to substance, NWA objects to Lifeway's using the phrase "Closure Clause" (Doc. No. 91 ¶¶ 35–36), while Lifeway objects to NWA's using the word "however." (Doc. Nos. 89 & 96 ¶ 37). Each party raises materiality and relevancy objections. (Doc. No. 98 ¶¶ 12–13, 15 (NWA); Doc. Nos. 89 & 96 ¶¶ 5, 12, 14–16, 42–44, 48 (Lifeway); Doc. No. 96 ¶¶ 28, 57–59, 61–62 (Lifeway)). And Lifeway objects to potential implications that could be drawn from NWA's facts (Doc. Nos. 89 & 96 ¶¶ 6, 27, 46, 54) and to NWA's purportedly listing legal conclusions as facts. (Doc. No. 89 & 96 ¶¶ 19, 31, 43, 48, 50; Doc. No. 96 ¶¶ 56, 61). At summary judgment, however, the Court does not need to settle semantic disputes presented in the guise of objections or make individual rulings on objections to materiality, relevance, and presentation of law-as-fact. These objections "are 'duplicative of the summary judgment standard itself,'" see Sandoval v. Cnty. of San Diego, 985 F.3d 657, 665 (9th Cir. 2021) (quoting Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006)), as the Court is already required to decide if "the evidence viewed in the light most favorable to the non-moving party creates a 'genuine dispute as to any material fact' that must be resolved at trial." Id. (quoting Fed. R. Civ. P. 56(a)) (observing that evidence is necessarily relevant if it creates a genuine dispute of material fact). The Court agrees with the Ninth Circuit that "parties briefing summary judgment motions would be better served to 'simply argue' the import of the facts reflected in the evidence rather than expending time and resources compiling laundry lists of . . . objections" on issues the Court is already bound to consider. See id. (quoting Burch, 433 F. Supp. 2d at 1119). The parties are assured that the Court has considered the text of the relevant contract on its own, made its own legal conclusions, and based its ruling on facts that it considers material and relevant, in accordance with Rule 56(a).

2

The Service Agreement states that NWA "will manage the solid waste and recyclable services . . . for the locations listed in Addendum A for services effective November 1, 2018 through October 31, 2023, and all locations that are opened and acquired during the term of this agreement." (Doc. No. 1-2 at 2).[2] Addendum A lists 143 retail locations. (See id. at 11–15). The Service Agreement also includes a "Cancellation" Clause that is the focal point of the parties' breach dispute, discussed in detail below. (See id. at 5–6).

After reviewing sales information for the 2018 Christmas season, Lifeway decided to close all its retail locations. (Doc. No. 91 ¶ 21). Neither party anticipated this decision when it entered the Service Agreement. (Id.). In March 2019, Lifeway notified NWA of this decision. (Id. ¶ 22). Between May 2019 and November 30, 2019, Lifeway closed all retail locations, communicating with NWA about the timing of each closure and cancelling NWA's services at each closed location. (Id. ¶¶ 22, 27). NWA has not provided any services to Lifeway since the final location closed, and Lifeway paid every invoice tendered by NWA. (Id. ¶¶ 27–28).

NWA sued Lifeway, asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and quantum meruit. (Doc. No. 1 at 4–7). The Complaint also requests punitive damages and attorney's fees. (Id. at 7). The Court previously dismissed NWA's implied-covenant claim. (Doc. No. 42). Cross-motions for summary judgment on the remaining claims followed.

## II. STANDARD OF REVIEW

The Court will grant summary judgment if a moving party shows that "there is no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return

---

[2] The Court will cite to the parties' filings—including the Service Agreement, the parties' briefs, and depositions—using the pagination generated by CM/ECF rather than the internal pagination of the filing.

3

a verdict in favor of the non-moving party." Niemi v. NHK Spring Co., 543 F.3d 294, 298 (6th Cir. 2008) (citing Hedrick v. W. Reserve Care Sys., 355 F.3d 444, 451 (6th Cir. 2004)). And "[a] factual dispute concerns a 'material' fact only if its resolution might affect the outcome of the suit under the governing substantive law." Id. (citing Hedrick, 355 F.3d at 451). "In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party." Salling v. Budget Rent-A-Car Sys., Inc., 672 F.3d 442, 444 (6th Cir. 2012) (citation omitted).

## III. ANALYSIS

### A. Breach of Contract

A choice-of-law provision in the Service Agreement specifies that Connecticut law applies to NWA's breach of contract claim. (Doc. No. 1-2 at 8). There are four elements to this claim: "[F]ormation of an agreement, performance by one party, breach of the agreement by the other party, and damages." Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C., 311 Conn. 282, 291 (2014). The contested elements here are breach and damages.

Under Connecticut law, the first step to interpretating contested contract language is to "ascertain the parties' intent from the language they used in their contract, looking at the contract as a whole and giving the contract's words their ordinary meaning and one that renders its provisions consistent." C & H Elec., Inc. v. Town of Bethel, 312 Conn. 843, 853 (2014) (citing Murtha v. Hartford, 303 Conn. 1, 7–8 (2011)). The "fundamental question" at the outset of the analysis is whether the relevant language is ambiguous. Cruz v. Visual Perceptions, LLC, 311 Conn. 93, 101 (2014). "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." Id. at 102–03 (United Illuminating Co. v. Wisvest-Connecticut, LLC, 259 Conn. 665, 670 (2002)).

Contract language is unambiguous where it is "clear and conveys a definite and precise intent." Id. at 102–03 (quoting United Illuminating, 259 Conn. at 670). "[T]here is a presumption against finding ambiguity where . . . a contract is of a commercial nature between sophisticated parties." Omega Eng'g, Inc. v. Omega, S.A., 432 F.3d 437, 446 (2d Cir. 2005) (citing United Illuminating, 259 Conn. at 670). When contract language is unambiguous, the Court may not consider extrinsic evidence "to learn what was intended, or to contradict what is written." Cruz, 311 Conn. at 106 (quoting Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., L.P., 252 Conn. 479, 502 (2000)). "The interpretation of definitive contract language is a question of law." CCT Commc'ns, Inc. v. Zone Telecom, Inc., 327 Conn. 114, 133 (2017) (citing Joseph Gen. Contracting, Inc. v. Couto, 317 Conn. 565, 575 (2015)).

By contrast, contract language is ambiguous where it "is susceptible to more than one reasonable interpretation." Cruz, 311 Conn. at 103 (quoting United Illuminating, 259 Conn. at 671). "'[A]ny ambiguity in a contract must emanate from the language used' by the parties." United Illuminating, 259 Conn. at 671 (quoting Levine v. Massey, 232 Conn. 272, 278 (1995)). "[W]hen contract language is ambiguous and there is extrinsic evidence of the parties' intent, the trial court must consider that evidence." Cruz, 311 Conn. at 104 n.11 (citing Schilberg Integrated Metals Corp. v. Cont'l Cas. Co., 263 Conn. 245, 277 (2003)). Determining the parties' intent from ambiguous contract language "is a question of fact." Id. at 101 (quoting Ramirez v. Health Net of the Ne., Inc., 285 Conn. 1, 13 (2008)).

1. Breach

The contested contract language is primarily found in the Cancellation Clause of the Service Agreement. (See Doc. No. 1-2 at 5–6). NWA argues that Lifeway acted contrary to its obligations under this clause by closing all retail locations, cancelling all of NWA's services, and

5

terminating the Service Agreement. (Doc. No. 68 at 14–16). Lifeway maintains that the Cancellation Clause unambiguously permits it to close any location and cancel NWA's services at that location; that authorization does not change, Lifeway argues, simply because it chose to close *all* its locations and cancel *all* of NWA's services. (Doc. No. 65 at 16, 18–19). As explained below, the relevant language of the Cancellation Clause is ambiguous, and the extrinsic evidence of the parties' intent is not so one-sided that the Court can resolve the breach dispute on summary judgment.

A. <u>Ambiguity</u>

The Cancellation Clause spans pages four and five of the eight-page Service Agreement. (Doc. No. 1-2 at 5–6). It begins:

> <u>Cancellation</u>: [Lifeway] may cancel service at any location where service is no longer needed due to location closure and the price to [Lifeway] will be reduced according to the reduction in service. [Lifeway] will give sufficient notice to [NWA] concerning location closures.

(<u>Id.</u> at 5). Later within the same clause, it states:

> After the initial sixty (60) days from the beginning date of this Agreement (transition period), Agreement may be terminated or otherwise canceled by either party for non-performance upon (60) days written notice. . . . This Agreement may not be terminated or otherwise canceled by either party without cause.

(<u>Id.</u> at 6).

Reading the Cancellation Clause as a whole, the Court concludes, as it did when considering Lifeway's motion to dismiss,[3] that the relevant language is ambiguous. On one hand,

---

[3] In ruling on the motion to dismiss, the Court concluded that the "the plain terms of the cancellation provision are conflicting and ambiguous." (Doc. No. 42 at 4). The parties dispute whether the Court is bound by this ruling on summary judgment. (<u>See</u> Doc. No. 90 at 9–10 (NWA); Doc. No. 65 at 26–28 (Lifeway); Doc. No. 95 at 3 (Lifeway)). Connecticut courts generally adhere to prior ambiguity rulings under the "law-of-the-case doctrine." <u>See</u> <u>Metsack v. Liberty Mut. Fire Ins. Co.</u>, No. 3:14-cv-01150, 2017 WL 706599, at *5 (D. Conn. Feb. 21, 2017) (discussing doctrine when ruling on Connecticut contract claims). Reconsideration is justified only in limited circumstances, including when the prior ruling was clearly erroneous. <u>See</u> <u>id.</u> (citing <u>United States v. Carr</u>, 557 F.3d 93, 102 (2d Cir. 2009)). The Court has

it is reasonable for Lifeway to favor a broad reading of this clause that places no limit on its right to "cancel service at *any* location where service is no longer needed due to location closure." (Doc. No. 1-2 at 5 (emphasis added)). After all, "use of the word 'any' to modify [a] phrase . . . gives the resulting phrase an expansive meaning—one that [the Court] will not restrict in the absence of a clear limitation in the text." <u>Salce v. Wolczek</u>, 314 Conn. 675, 686 (2014) (collecting cases). But the subsequent language of the Cancellation Clause is broad as well. That language specifies that the Service Agreement may not be "terminated *or otherwise canceled* by either party" except for "non-performance" or "cause." (Doc. No. 1-2 at 6 (emphasis added)). One reasonable interpretation of this language is that cancelling all services effectively "terminate[s] or otherwise cancel[s]" the Service Agreement without the required cause. This interpretation gives effect to the entirety of the Cancellation Clause. <u>See</u> <u>Alerion Inv. Partners I, L.P. v. Valassis Commc'ns, Inc.</u>, No. HHDX04CV126030522S, 2013 WL 5969059, at \*8 (Conn. Super. Ct. Oct. 15, 2013) (stating in its ambiguity analysis that "[t]he rules of contract interpretation require the court to read the contract as a whole and in such a way as all of its terms have meaning"). And the necessary implication of this interpretation is that the text of the Cancellation Clause imposes *some* limit on Lifeway's right to cancel services, such that Lifeway cannot cancel *all* service in the absence of non-performance or cause before the expiration of the Service Agreement's five-year term.

Each party maintains that the Service Agreement is written unambiguously in its favor, but the Court is not so persuaded. NWA makes two arguments in this regard. First, it says that the Service Agreement "makes clear that it is terminated when a party 'cancels services.'" (<u>See</u> Doc. No. 90 at 17 n.9). If that were the case, then NWA would be correct that Lifeway's cancellation of all services was clearly tantamount to unauthorized termination. But the language on which NWA

_____

freshly considered the ambiguity question here and reached the same conclusion as before, even if its reasoning is not identical.

relies for this argument is found in the final sentence of the "Payment Terms" Clause, and in full, this sentence states: "*For purposes of this provision*, termination of the Agreement occurs when either party sends the other party notice of its intention to terminate the Agreement or cancel services." (Doc. No. 1-2 at 5 (emphasis added)). Based on the clear limiting phrase that begins this sentence, the Court's interpretation of the relevant language in the Cancellation Clause is unaffected by NWA's favored language from the Payment Terms Clause.

Second, NWA argues that the Service Agreement defines when Lifeway may close individual retail locations, and that those conditions were not met here. (Doc. No. 68 at 20). For this point, NWA relies on the following sentence in the "Miscellaneous" Clause on the eighth and final page of the Service Agreement: "Customer may close individual stores and cease services without penalty as part of normal business operations."[4] (Doc. No. 1-2 at 9). But the four sentences preceding this sentence in the Miscellaneous Clause all pertain to assignment of the Service Agreement. (See Doc. No. 1-2 at 9). And the immediately preceding sentence specifically states that the Service Agreement "shall be binding to successor or assigns of [sold or assigned] locations at Contractor's discretion." (Id.) Based on its placement in the text of the Miscellaneous Clause, therefore, it is unclear which party is bound by the limitation in NWA's favored sentence— Lifeway (prior to the assignment or sale of locations), a successor party (following an assignment or sale), or both.

Lifeway's unambiguity argument fares no better. It maintains that the Service Agreement confers an unambiguous right to cancel all services that is consistent with the Agreement's structure as a "requirements contract." (Doc. No. 65 at 20–25). As general matter, a "'requirements contract' [is] one in which 'a buyer promises to buy and a seller to supply all the goods or services

---

[4] Lifeway does not dispute that "closing all of its retail locations was not part of its normal business operations." (Doc. No. 89 ¶ 41).

that a buyer needs during a specified period' and . . . such contract 'assures the buyer of a source for the period of the contract.'" <u>RBC Nice Bearings, Inc. v. SKF USA, Inc.</u>, 318 Conn. 737, 761 (2015) (quoting <u>Black's Law Dictionary</u> (9th Ed. 2009)). "[C]ourts generally have concluded that 'the seller assumes the risk of all good faith variations in the buyer's requirements even to the extent of a determination to liquidate or discontinue the business.'" <u>Wiseco, Inc. v. Johnson Controls, Inc.</u>, 155 F. App'x 815, 817–18 (6th Cir. 2005) (quoting <u>Empire Gas Corp. v. Am. Bakeries Co.</u>, 840 F.2d 1333, 1337 (7th Cir. 1988)). In this context, Lifeway argues, there is nothing wrong with Lifeway's "setting its requirements to zero—so long as zero is [Lifeway's] good-faith requirement." (Doc. No. 65 at 20–23 (quoting <u>Silver Foam Distrib. Co. v. Labatt Brewing Trading Co.</u>, No. 20-10681, 2021 WL 859043, at *6 (E.D. Mich. Mar. 8, 2021)).

Lifeway's position may be correct as it pertains to requirements contracts generally, but the Court is not considering an abstract contract. It must interpret the contract before it, and here, the Service Agreement has a Cancellation Clause that says it cannot be "terminated or otherwise canceled" absent "non-performance" or "cause," without conclusively defining what constitutes "terminat[ing] or otherwise cancel[ing]." (Doc. No. 1-2 at 5–6). The Cancellation Clause states that the Service Agreement "*may* be terminated or otherwise canceled by either party for non-performance upon (60) days written notice." (<u>Id.</u> at 6 (emphasis added)). Written notice following non-performance, therefore, is just one way to "terminate[] or otherwise cancel[]" the Service Agreement at the discretion of the party on the other side of the non-performance. But a reasonable interpretation of the Cancellation Clause—one that gives effect to all of its terms, as discussed above—is that cancelling all services effectively "terminate[s] or otherwise cancel[s]" the Service Agreement without the required cause. <u>Cf.</u> <u>Silver Foam</u>, 2021 WL 859043, at *9 (rejecting argument that failure to use services terminated requirements contract where, unlike here, the

9

contract specified that it "shall continue" until one of four specifically defined events occurred). For all of these reasons, the relevant language of the Cancellation Clause is ambiguous.

### B. Extrinsic Evidence

Because the Cancellation Clause is ambiguous, the Court must consider extrinsic evidence of the parties' intent. Cruz, 311 Conn. at 104 n.11. NWA primarily relies on two groups of evidence: testimony from the deposition of Rick Mathis, Lifeway's corporate designee under Federal Rule of Civil Procedure 30(b)(6) (Doc. No. 68 at 16–17, 20–21); and the parties' negotiations prior to formation of the Service Agreement. (Id. at 22–24). Lifeway points to three groups of evidence: the deposition testimony of NWA's Rule 30(b)(6) designee Carmine Esposito (Doc. No. 65 at 22); evidence that NWA was the author of the Service Agreement (id.); and evidence of the parties' intended meaning for NWA's favored language in the Miscellaneous Clause. (Doc. No. 95 at 5). The Court will address each group of evidence in turn.

### i. Mathis Deposition

Rick Mathis was asked if he was "the person at Lifeway that was responsible for negotiating" the Service Agreement, and he responded, "More or less, yes." (Doc. No. 91-15 at 8). Mathis was later asked if he would have entered the Service Agreement if he "thought the retail locations would close down en masse or close down completely within the five-year period," and he responded, "No." (Id. at 98). Asked why not, Mathis said, "I don't intentionally enter into any contract we have . . . no intention of following. If I knew we weren't gonna do it, I would not have a contract signed." (Id.).

NWA contends that this testimony amounts to an admission of breach by Lifeway. (Doc. No. 90 at 8, 26). Later within his deposition, however, Mathis clearly stated that the Cancellation Clause gave Lifeway the right to "close every location if [it] needed" (Doc. No. 91-15 at 104)—

testimony inconsistent with an admission of breach. And the Sixth Circuit has recently explained that "most courts don't treat concessions by Rule 30(b)(6) designees as binding." Mays v. LaRose, 951 F.3d 775, 790 (6th Cir. 2020) (citing Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc., 839 F.3d 1251, 1260 (10th Cir. 2016)); see also R & B Appliance Parts, Inc. v. Amana Co., L.P., 258 F.3d 783, 786 (8th Cir. 2001) (explaining that a corporate designee's testimony binds the corporation to the same extent as "any witness is by his or her prior deposition testimony. A witness is free to testify differently from the way he or she testified in a deposition, albeit at the risk of having his or her credibility impeached by introduction of the deposition."). Mathis' deposition, therefore, does not require Lifeway to concede that it breached the Service Agreement.

But that does mean that Mathis' deposition is entirely unhelpful to NWA. Mathis also testified that, when the parties entered the Service Agreement, he did not have in mind the interpretation on which Lifeway now relies—that the Cancellation Clause confers an unlimited right for Lifeway to close all locations. (See Doc. No. 91-15 at 104–06 ("Q. Okay. In fact, you never thought of that interpretation of that Cancellation provision when this agreement was entered into, did you, sir? A. No, sir.")). Lifeway may argue that Mathis did not have that interpretation in mind simply because—as is undisputed (Doc. No. 91 ¶ 21)—neither party anticipated Lifeway's decision to close all retail locations when they formed the Service Agreement. But drawing reasonable inferences in NWA's favor, Mathis' testimony may support a finding that the parties intended for the Cancellation Clause to impose *some* limit on Lifeway's right to cancel services.

## ii. Negotiations

NWA next argues that the substance of negotiations leading to formation of the Service Agreement reflects the parties' shared intent for NWA to provide services to Lifeway for the duration of the five-year term. During negotiations, NWA reminded Lifeway that its offer of an

11

immediate 35% savings "was possible due to the existing language of the Agreement; i.e. the 5-year term." (Doc. No. 89 ¶ 10). Indeed, Lifeway specifically sought to add a provision allowing it "to terminate or cancel the parties' Agreement for any reason or no reason at all," and NWA rejected that request. (Id. ¶ 12–13). In doing so, NWA noted in a comment on the draft agreement that "[c]ancellation for other than [n]on-performance would defeat the full term purpose of the mutual service agreement." (Id. ¶ 13). Lifeway also sought to remove the Service Agreement's right-of-first-refusal provision, and NWA rejected this request with a comment explaining: "If we have worked very hard throughout the life of the agreement to insure your satisfaction... we would like to have a commitment to at least consider us in the future." (Id. ¶ 31). Drawing reasonable inferences in NWA's favor, its comments during contract negotiation may weigh in favor of a finding that the parties' intent at formation aligns with NWA's position.

### iii. Esposito Deposition

Turning to Lifeway's extrinsic evidence, Carmine Esposito testified that he was "the main person" for NWA involved in revising the draft agreement with Lifeway prior to formation of the Service Agreement. (Doc. No. 66-2 at 8–9). Esposito was asked if NWA "knew that Lifeway could open or close stores" "[g]oing into this contract," and he responded, "Yes." (Id. at 50). Esposito was then asked if the process followed by Lifeway as it closed stores was "at least a reasonable reading" of the Cancellation Clause, and he said, "Yes." (Id. at 53–54). As NWA points out, Esposito also testified that Lifeway's reliance on the Cancellation Clause to justify the cancellation of all services was "improper[]." (Doc. No. 91-17 at 12). But drawing reasonable inferences in Lifeway's favor, Esposito's testimony may weigh in favor of a finding that the parties intended to confer Lifeway the right to close all stores and cancel all services prior to expiration of the Service Agreement's five-year term.

iv. Authorship

Next, Lifeway argues that NWA drafted the contested language in the Cancellation Clause, so any ambiguities must be construed against NWA. (Doc. No. 65 at 22). To support its assertions of fact regarding NWA's authorship of this and other contract provisions, Lifeway cites to Esposito's deposition and the declaration of Lori Morrison, a former Lifeway paralegal involved in Lifeway's negotiation of the Service Agreement. (See Doc. No. 91 ¶¶ 4, 10, 13, 15, 18). NWA argues that the Court should not consider Morrison's declaration for several reasons (Doc. No. 90 at 21–22), and Lifeway disagrees. (Doc. No. 95 at 3–4). The Court need not resolve this dispute, however, because Esposito's deposition is consistent with Morrison's declaration on the factual questions of authorship and the negotiation process. (Compare Doc. No. 66-2 at 9–12, 18–26 (Esposito deposition), with Doc. No. 66-6 ¶¶ 6–11 (Morrison declaration)).[5]

Esposito testified that the drafting process began with NWA's standard contract, and that the first part of the Cancellation Clause—including the language providing that Lifeway "may cancel service at any location where service is no longer needed due to location closure"—is part of NWA's standard contract language. (Doc. No. 66-2 at 9–12, 57–58). Lifeway did not request any changes to this language. (Id. at 19–20). As discussed above, Lifeway did request a change to subsequent language in the Cancellation Clause that would permit it "to terminate or cancel the parties' Agreement for any reason or no reason at all." (Doc. No. 89 ¶ 12). NWA, however, refused this request (id. ¶ 13), so the record reflects that NWA's standard contract language also included

---

[5] To the extent that Morrison's declaration purports to assert Morrison's personal knowledge of NWA's intent during negotiations (see Doc. No. 66-6 ¶¶ 11–13), the Court agrees with NWA that Morrison—a Lifeway paralegal—cannot speak for NWA. See Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

13

that the Service Agreement could not be "terminated or otherwise canceled" absent "non-performance" or "cause."

"Contra proferentem" is a doctrine of contract interpretation "whereby ambiguities in a contract are construed against the party who had drafted the contract." David M. Somers & Assocs., P.C. v. Busch, 283 Conn. 396, 405 (2007) (citing Connecticut Ins. Guar. Ass'n v. Fontaine, 278 Conn. 779, 784–89 (2006)). Applying this doctrine here, the extrinsic evidence that NWA drafted the contested language in the Cancellation Clause may weigh in favor construing the Cancellation Clause against NWA. But Connecticut courts have traditionally applied this doctrine to "insurance contracts," contracts where the drafter has "superior knowledge," or contracts where the drafter has some duty to represent the interests of the non-drafting party. See id. (applying contra proferentem to attorney retainer agreement). None of those circumstances is present here. And the Connecticut Supreme Court has described contra proferentem as "applicable only as a last resort, when other techniques of interpretation and construction have not resolved the question of which of two or more possible meanings the court should choose." Cruz, 311 Conn. at 107 (quoting Montoya v. Montoya, 881 A.2d 319, 331 (Conn. App. Ct. 2005)). Given the other extrinsic evidence in the record, therefore, NWA's authorship of the ambiguous language in the Cancellation Clause does not require the Court to grant summary judgment in Lifeway's favor.

## v. Meaning of Provision in Miscellaneous Clause

The Miscellaneous Clause, to restate, begins with four sentences concerning the assignment of the Service Agreement, and then includes this sentence: "Customer may close individual stores and cease services without penalty as part of normal business operations." (Doc. No. 1-2 at 9). It is undisputed that this sentence was added during negotiations (Doc. No. 91 ¶ 18), and Esposito testified that it was added as result of a Lifeway's raising a concern that the draft

14

agreement was unfairly restrictive on a successor following sale or assignment. (Doc. No. 89-2 at 17–18, 21–22). Esposito was asked if the added sentence "was meant to protect National Waste in the event that Lifeway sold or assigned the assets of the business of certain locations," and he responded, "Yes." (Id. at 20). Drawing reasonable inferences in Lifeway's favor, this evidence may weigh in favor of a finding that the parties intended NWA's favored sentence in the Miscellaneous Clause to apply to a successor following a sale or assignment by Lifeway—not Lifeway itself.

C. Conclusion

In sum, the relevant language of the Cancellation Clause is ambiguous, in that it has at least two reasonable meanings: one, that Lifeway had an unlimited right to close locations and cancel services absent bad faith by Lifeway; and two, that Lifeway's right was limited such that it could not cancel *all* services prior to expiration of the five-year term absent non-performance or cause by NWA. Factors weighing in favor of the first interpretation include the broad language in the first sentence of the Cancellation Clause—that Lifeway "may cancel service at any location where service is no longer needed due to location closure"—as well as extrinsic evidence from Esposito's deposition reflecting NWA's understanding and authorship of the contested contract provisions. Factors weighing in favor of the second interpretation include the broad language in the subsequent section of the Cancellation Clause—that Lifeway could not "terminate[] or otherwise cancel[]" the Service Agreement absent "non-performance" or "cause"—as well as extrinsic evidence of the parties' negotiations and Mathis' deposition reflecting Lifeway's understanding of the contested contract provisions.

Where the meaning of ambiguous contract language "can be understood only from extrinsic facts, the construction is generally a question of fact for the jury." Foley v. Huntington

15

Co., 682 A.2d 1026, 1038 (Conn. App. Ct. 1996) (quoting School District No. 8 v. Lynch, 33 Conn. 330, 333 (1866)); Connecticut Ins. Guar. Ass'n v. Fontaine, 278 Conn. 779, 788 (2006) (quoting Metropolitan Life Ins. Co. v. Aetna Casualty & Surety Co., 255 Conn. 295, 306 (2001)) ("[I]f the extrinsic evidence presents issues of credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact."). Here, the Court cannot "resolve ambiguity" in the contested contract language "as a matter of law" because the relevant extrinsic evidence is not "so one-sided that no reasonable person could decide the contrary." See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 158 (2d Cir. 2000) (quoting 3Com Corp. v. Banco do Brasil, S.A., 171 F.3d 739, 746–47 (2d Cir. 1999)). A jury must resolve the ambiguity in the Cancellation Clause to determine if Lifeway enjoyed an unlimited right to cancel NWA's services. See Gallien v. Connecticut Gen. Life Ins. Co., 49 F.3d 878, 884 (2d Cir. 1995) ("[B]ecause the contract is ambiguous, and because relevant extrinsic evidence of the parties' intent exists, a trier of fact must resolve the ambiguity in the contract to determine whether Connecticut General enjoyed a waivable right to cancel coverage."). Accordingly, both parties' request for summary judgment on the breach-of-contract claim will be denied. See Compagnie Financiere, 232 F.3d at 157 (citing Mellon Bank v. United Bank Corp., 31 F.3d 113, 115 (2d Cir. 1994)) ("Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous.").

    2. Damages

As for the damages element of NWA's breach-of-contract claim, NWA seeks contract damages, contractual attorney's fees, and punitive damages. (Doc. No. 68 at 24–26). The Court will address each category of damages in turn.

A. <u>Contract Damages</u>

Under Connecticut law, a plaintiff prevailing on a breach-of-contract claim "is entitled to compensation which will place [it] in the same position [it] would have been in had the contract been properly performed. . . . Such damages are measured as of the date of the breach." <u>Naples v. Keystone Bldg. & Dev. Corp.</u>, 295 Conn. 214, 224 (2010) (quoting <u>Levesque v. D & M Builders, Inc.</u>, 170 Conn. 177, 180 (1976)). A prevailing plaintiff can recover lost profits as a damage award where it carries its burden of "present[ing] sufficiently accurate and complete evidence for the trier of fact to be able to estimate those profits with reasonable certainty." <u>Sun Val, LLC v. Comm'r of Transportation</u>, 330 Conn. 316, 338 (2018) (quoting <u>Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin</u>, 247 Conn. 48, 70 (1998)). "A damage theory may be based on assumptions so long as the assumptions are reasonable in light of the record evidence." <u>Beverly Hills Concepts</u>, 247 Conn. at 70 (quoting <u>Westport Taxi Serv., Inc. v. Westport Transit Dist.</u>, 235 Conn. 1, 28 (1995)). The plaintiff, however, "cannot recover for 'the mere possibility' of making a profit." <u>Id.</u> (quoting <u>Goldman v. Feinberg</u>, 130 Conn. 671, 674–75 (1944)).

NWA requests the approximate monthly revenue it claims it was earning from the Lifeway account when Lifeway cancelled all services with 47 months remaining in the Service Agreement ($4,563.77 in monthly revenue multiplied by 47 months, for a total of $214,497.17). (Doc. No. 68 at 25). Lifeway argues that this damages theory assumes "either (1) that Lifeway would have continued to operate all its stores—which is not just speculative, but counterfactual, or (2) that Lifeway was obligated to pay NWA its self-determined profits even if Lifeway's requirements diminished or vanished." (Doc. No. 88 at 23).

The parties' dispute on contract damages is not for the Court to resolve at this time. NWA's entitlement to damages necessarily depends on whether a jury finds that Lifeway breached the

Cancellation Clause. And if a jury finds in NWA's favor on that point, the jury will determine the extent of the contract damages as well. See Carrol v. Allstate Ins. Co., 262 Conn. 433, 449 (2003) (quoting Childs v. Bainer, 235 Conn. 107, 112 (1995)) ("The amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the jury.")

    B. Attorney's Fees

NWA also requests contractual attorney's fees. (Doc. No. 68 at 25; Doc. No. 90 at 24–25). Based on the Service Agreement's choice-of-law provision, Connecticut law applies to this request. See Boswell v. RFD-TV the Theater, LLC, 498 S.W.3d 550, 559 (Tenn. Ct. App. 2016) (holding that "a claim for attorney's fees pursuant to a contract" is "a substantive issue governed by a choice of law provision in that contract"). "Connecticut follows the American rule," which provides that "'attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception.'" Lyme Land Conservation Tr., Inc. v. Platner, 325 Conn. 737, 759–60 (2017) (quoting ACMAT Corp. v. Greater New York Mut. Ins. Co., 282 Conn. 576, 582 (2007)). Here, NWA relies on the following contract provision in the Payment Terms Clause of the Service Agreement: "[Lifeway] is liable for legal fees and costs of collection necessitated by [Lifeway's] non-payment." (Doc. No. 1-2 at 5.) Lifeway argues that this provision does not apply in the context of Lifeway's alleged breach. (Doc. No. 88 at 25). The Court agrees with Lifeway.

The Payment Terms Clause plainly describes the invoice process—NWA's issuance of invoices, Lifeway's payment of invoices, and NWA's rights in the event that Lifeway does not pay an invoice in a timely manner. (See Doc. No. 1-2 at 5–6). It then says that Lifeway "is liable for legal fees and costs of collection necessitated by [Lifeway's] non-payment." (Id. at 6). But NWA does not claim that Lifeway breached the Settlement Agreement by failing to properly pay

18

an invoice.[6] Instead, NWA claims that Lifeway breached by terminating or otherwise cancelling the Settlement Agreement in an unauthorized manner, and that the term "non-payment" in the attorney's fee provision of the Payment Terms Clause includes Lifeway's failure to pay "amounts due and owing under the Agreement as a result of Lifeway's breach." (Doc. No. 68 at 25). This position, however, "would support the award of attorney's fees in any action for breach of contract, in that the fees are, broadly, incurred because of the breach," and Connecticut courts have refused to stretch the American rule that far. See Aurora Loan Servs., LLC v. Hirsch, 154 A.3d 1009, 1018 (Conn. App. Ct. 2017) (citing Total Recycling Servs. of Conn., Inc. v. Conn. Oil Recycling Servs., LLC, 308 Conn. 312, 326 (2013)). Accordingly, the Court finds that the text of the Service Agreement does not allow NWA to recover attorney's fees for Lifeway's alleged breach.

### C. Punitive Damages

Finally, as an alternative theory of recovery for attorney's fees, NWA requests punitive damages under Connecticut common law. (Doc. No. 68 at 25; Doc. No. 90 at 25); see Berry v. Loiseau, 223 Conn. 786, 827 (1992) (collecting cases) ("[C]ommon law punitive damages serve primarily to compensate the plaintiff for his injuries and, thus, are properly limited to the plaintiff's litigation expenses less taxable costs."). Lifeway insists that, under a traditional choice-of-law analysis, the Court must apply Tennessee law to NWA's request for punitive damages, and that awarding such damages in this "garden variety contract dispute" would be against the public policy of Tennessee. (See Doc. No. 95 at 6).

Lifeway's analysis ignores the choice-of-law clause in the Settlement Agreement. This clause plainly covers NWA's request for punitive damages. (See Doc. No. 1-2 at 8 (providing that "any claim or defense arising out of this Agreement shall be construed, interpreted and governed

---

[6] Nor could it, as it is undisputed that Lifeway paid all invoices issued by NWA. (Doc. No. 91 ¶ 28).

19

in accordance with the laws of the State of Connecticut"). And "Tennessee will honor a choice of law clause if the state whose law is chosen bears a reasonable relation to the transaction and absent a violation of the forum state's public policy." Boswell, 498 S.W.3d at 556 (quoting Bourland, Heflin, Alvarez, Minor & Matthews, PLC v. Heaton, 393 S.W.3d 671, 674 (Tenn. Ct. App. 2012)).[7] A state encompassing one party's headquarters is enough to establish "a reasonable relation to the transaction," at least where the choice-of-law clause is "valid and enforceable." See id. Here, NWA is based in Connecticut, and it is undisputed that the Service Agreement is valid and enforceable. (Doc. No. 91 ¶ 2). Accordingly, the Court will apply Connecticut law to NWA's punitive-damages request unless doing so would violate Tennessee's public policy.[8]

The Court sees no public policy concern here. Indeed, the laws of Tennessee and Connecticut on this subject appear to be remarkably similar. In both states, punitive damages may be awarded for a breach of contract in rare but well-defined circumstances. See Rogers v. Louisville Land Co., 367 S.W.3d 196, 211 n.14 (Tenn. 2012) (citations omitted) ("Although as a general matter, punitive damages are not available in a breach of contract case, punitive damages may be awarded in such a case under certain circumstances."); L.F. Pace & Sons, Inc. v. Travelers Indem. Co., 514 A.2d 766, 775 (Conn. App. Ct. 1986) (internal citations and quotation marks omitted) ("Punitive damages are not ordinarily recoverable for breach of contract. . . . The few

---

[7] If there were no contractual choice-of-law provision, however, the "most significant relationship" approach cited by Lifeway would apply. (See Doc. No. 65 at 31); Aguirre Cruz v. Ford Motor Co., 435 F. Supp. 2d 701, 703 (W.D. Tenn. 2006) (internal citations and quotation marks omitted) (explaining, in a non-contract case, that "Tennessee has adopted" the "most significant relationship approach," under which "the law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation").

[8] The Court notes that, regardless of the parties' choice of law, Tennessee law would govern NWA's request for punitive damages if this request were a matter of procedural law rather than substantive law. See Boswell, 498 S.W.3d at 556. Lifeway, however, makes no argument that NWA's request for punitive damages is a procedural matter.

classes of cases in which such damages have been allowed contain elements which bring them within the field of tort."). Accordingly, because Lifeway has not demonstrated that it would violate Tennessee's public policy to do so, the Court will apply the contractually-chosen law of Connecticut to NWA's request for punitive damages. See Com. Painting Co. Inc. v. Weitz Co. LLC, No. W2019-02089-COA-R3-CV, 2022 WL 737468, at *25 (Tenn. Ct. App. Mar. 11, 2022) (collecting Tennessee cases in which punitive damages were awarded for breach of contract).

In Connecticut, "punitive damages are not ordinarily recoverable in a simple breach of contract case," but there is "a small subset of contract cases involving elements of torts in which punitive damages may be awarded." Uberti v. Lincoln Nat. Life Ins. Co., 144 F. Supp. 2d 90, 107 (D. Conn. 2001) (citing Triangle Sheet Metal Works, Inc. v. Silver, 154 Conn. 116 (1966)). To award punitive damages, "evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights." Lee v. AIG Cas. Co., 919 F. Supp. 2d 219, 231 (D. Conn. 2013) (quoting Venturi v. Savitt, Inc., 191 Conn. 588, 592 (1983)).

NWA claims that Lifeway's alleged breach was reckless. "Recklessness 'requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable [person].'" Id. at 232 (quoting Mooney v. Wabrek, 129 Conn. 302, 308 (1942)). The District of Connecticut, in addressing a plaintiff's request for punitive damages based on an allegedly reckless breach of contract, discussed the showing required to survive a defendant's summary judgment motion as follows:

> "Recklessness is a state of consciousness with reference to the consequences of one's acts. It is more than negligence, more than gross negligence." Dubay v. Irish, 207 Conn. 518, 532 (1988) (internal quotation marks and citation omitted). "Under Connecticut law, recklessness may be inferred from a party's conduct." Pouliot v. Paul Arpin Van Lines, Inc., 367 F. Supp. 2d 267, 275 (D. Conn. 2005). "Summary Judgment may . . . be appropriate [as to whether conduct is reckless] where the

21

relevant facts are undisputed and 'when the mind of a fair and reasonable [person] could reach but one conclusion' on the basis of those facts." Id. (quoting Dubay, 207 Conn. at 535 n.10).

Lee, 919 F. Supp. 2d at 231–32.

As determined above, a reasonable jury could credit NWA's interpretation of the Cancellation Clause and therefore find that Lifeway breached the Service Agreement by cancelling all of NWA's services. The Court now concludes, for the purpose of this punitive damages dispute, that a reasonable person could find that Lifeway's breach was reckless. In support of this position, NWA again points to the deposition testimony of Lifeway's corporate designee, Rick Mathis, stating: "I don't intentionally enter into any contract we have . . . no intention of following. If I knew we weren't gonna do it, I would not have a contract signed." (Doc. No. 90 at 26). This testimony, viewed in NWA's favor, could support a finding that the parties intended for the Cancellation Clause to impose *some* limit on Lifeway's right to cancel services. And if Lifeway cancelled all services knowing that doing so was not permitted by the Service Agreement, a reasonable person could find that Lifeway was recklessly indifferent to NWA's rights under Connecticut law. See Landmark Inv. Grp., LLC v. CALCO Const. & Dev. Co., 318 Conn. 847, 879 (2015) (applying Connecticut law to find that breaching party acted "with at least reckless indifference to [the plaintiff's] rights" where the jury could infer "that the defendants acted to purposefully interfere with [the plaintiff's] contractual rights").

However, a reasonable jury could also find that Lifeway did not breach the Settlement Agreement at all. And even if the jury does find breach, a reasonable person could find that Lifeway's conduct did not rise to the level of justifying punitive damages under Connecticut law. See Uberti, 144 F. Supp. 2d at 107 (finding that evidence "sufficient to prove bad faith" by a breaching party did "not contain sufficient indicia of bad motive, wantonness, or outrageousness

22

to warrant imposition of punitive damages"). Accordingly, the Court will deny summary judgment to both parties on NWA's request for punitive damages.

## B. Unjust Enrichment and Quantum Meruit

NWA's remaining claims are for unjust enrichment and quantum meruit, and the parties agree that these claims are essentially the same. To that end, the parties agree that there is a preliminary question the Court must answer as a matter of law to determine these claims' viability, and that the answer to this question is the same under Tennessee and Connecticut law. (See Doc. No. 90 at 22 n.13; Doc. No. 88 at 27 n.3). Because the parties agree that there is no actual conflict of law on this point, the Court will apply the law of the forum state, Tennessee. See Gov't Emps. Ins. Co. v. Bloodworth, No. M2003-02986-COA-R10-CV, 2007 WL 1966022, at *29 (Tenn. Ct. App. June 29, 2007) (citing Portland Trailer & Equip., Inc. v. A-1 Freeman Moving & Storage, Inc., 49 P.3d 803, 806 (Or. Ct. App. 2002)) ("Where there is only a false conflict, the court may ignore choice of law questions and apply forum law.").

To proceed with these two claims, NWA must first demonstrate that there is "no existing, enforceable contract between the parties covering the same subject matter." Smith v. Hi-Speed, Inc., 536 S.W.3d 458, 480 (Tenn. Ct. App. 2016) (citing Crye-Leike, Inc. v. Carver, 415 S.W.3d 808, 824 (Tenn. Ct. App. 2011)). It is undisputed that the Service Agreement is valid and enforceable. (Doc. No. 91 ¶ 2). But NWA maintains that its quasi-contract claims are not covered by the Service Agreement because it "did not address the impact" of Lifeway's closing all of its retail locations "on Lifeway's right to retain the 35% up-front savings that NWA gave in consideration in exchange for receiving a 5-year term." (Doc. No. 68 at 26). Lifeway, by contrast, argues that the Service Agreement covers NWA's quasi-contract claims. (Doc. No. 65 at 29). The Court agrees with Lifeway.

23

Simply put, "[i]f there is already a contract in place governing a relationship, then there is no room for a court-imposed quasi-contract." Gottlieb, Tr. of Seals Fam. Tr. v. Warner Music Inc., No. 3:20-CV-00386, 2021 WL 6498744, at *7 (M.D. Tenn. Feb. 22, 2021); PSC Indus., Inc. v. Johnson, No. 3:19-CV-00362, 2021 WL 1663574, at *22 (M.D. Tenn. Apr. 28, 2021) (citations and footnote omitted) ("[A]n unjust enrichment claim cannot be maintained if there is a contract between the parties that governs the subject matter of the litigation."). Although quasi-contract claims may survive a motion to dismiss where they are pleaded in the alternative to a breach-of-contract claim, such claims "often prove to have been unnecessary" later in a case unless, for example, discovery reveals that the parties did "not, in fact, have" a "valid contract." Sugarlips Bakery, LLC v. A&G Franchising, LLC, No. 3:20-CV-00830, 2022 WL 210135, at *12 (M.D. Tenn. Jan. 24, 2022). That is not the case here. At the summary judgment stage, therefore, NWA cannot rely on its quasi-contract claims "to avoid 'an agreement deliberately entered into by the parties, however harsh the provisions of such contract may seem'" to NWA in hindsight. Est. of Lyons v. Baugh, No. M2017-00094-COA-R3-CV, 2018 WL 3578525, at *6 (Tenn. Ct. App. July 25, 2018) (quoting Jaffe v. Bolton, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991)); see also Smith, 536 S.W.3d at 481 ("The fact that [a valid contract] does not cover every element of consideration allegedly agreed to as part of a purported larger agreement does not mean that it does not cover the same subject matter."). Lifeway is entitled to summary judgment on NWA's claims for unjust enrichment and quantum meruit as a matter of law.

## IV. CONCLUSION

For these reasons, NWA's Motion for Summary Judgment (Doc. No. 67) will be denied, and Lifeway's Motion for Summary Judgment (Doc. No. 64) will be granted in part and denied in

part. The remaining matters in this case are NWA's breach-of-contract claim and NWA's request for punitive damages.

        An appropriate Order is filed herewith.

                                                        _____

                                                  WAVERLY D. CRENSHAW, JR.
                                                  CHIEF UNITED STATES DISTRICT JUDGE